**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AMBROSE BRANCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00523** |
| | ) | **Judge Aleta A. Trauger** |
| **WILSON COUNTY JAIL** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 46) filed by defendant Daniel Jenkins, the only defendant remaining in this case. For the reasons set forth herein, the motion will be granted, and this case will be dismissed.

## I.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff Ambrose Branch filed the Complaint initiating this action *pro se* and *in forma pauperis* on May 23, 2023, while he was an inmate in the custody of the Tennessee Department of Correction. (Doc. No. 1.) Pursuant to the Prison Litigation Reform Act, 28 U.S.C. §§ 1915(e)(2), 1915A(b), the court conducted an initial review of the Complaint and determined that it stated a colorable claim under 42 U.S.C. § 1983 against defendant Jenkins, based on allegations that Jenkins was deliberately indifferent to a substantial risk of serious harm to the plaintiff posed by another inmate and Jenkins' alleged failure to protect the plaintiff from being beaten by the other inmate. (Doc. No. 6 at 3–4.) The court also held that the Complaint failed to state a colorable claim

against the Wilson County Jail, also named as a defendant, on the basis that the jail is not a separate entity suable under § 1983 and because the allegations in the Complaint could not plausibly be construed to state a claim against Wilson County itself. (*Id.* at 4.) Wilson County Jail was dismissed, but the case was permitted to proceed against Jenkins. Counsel entered an appearance on behalf of the plaintiff in July 2024. (Doc. No. 17.) Additional counsel for the plaintiff entered an appearance in September 2025. (Doc. No. 54.)

After a period of discovery, Jenkins has now filed his Motion for Summary Judgment, supported by a Memorandum of Law (Doc. No. 48), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 47), and evidentiary material supporting the defendant's factual assertions. The plaintiff has filed a Response in opposition to the motion (Doc. No. 55) and a Response to the SUMF (Doc. No. 56), as well as some additional evidentiary material. The defendant filed a Reply. (Doc. No. 58.)

III.    **FACTS**[1]

Branch was incarcerated at the Wilson County Jail from December 4, 2022 to May 3, 2023. He was incarcerated for a probation violation during that time period, though he also faced pending charges that had not yet been resolved. (Doc. No. 46-2, Branch Dep. 12–13.)[2]

As of the morning of February 9, 2023, Branch was housed in J-pod, cell J-8, of the Wilson County Jail and did not have a cellmate. During the afternoon of February 9, 2023, a group of corrections officers, including Jenkins, escorted a small group of inmates who had been released

---

[1] The facts for which no record citation is provided are drawn directly from the plaintiff's Response to the defendant's SUMF and are undisputed for purposes of summary judgment. All facts are viewed in the light most favorable to the plaintiff as the non-moving party.

[2] The parties have filed excerpts of Branch's and Jenkins' deposition transcripts, rather than complete depositions. (Doc. Nos. 46-2, 58-1 (Branch), 55-2 (Jenkins).) The court cites herein to the original deposition pagination, rather than the pagination assigned by CM/ECF.

from segregation that day into J-pod to be reassigned to new cells in that pod. (Branch Dep. 40–41.)[3] Jenkins was the supervisor on the shift. (Jenkins Dep. 36.)

The "classification officer" at the jail is responsible for classifying inmates prior to assigning them, and jail administration makes the decision regarding which cells inmates released from segregation are assigned to. (Jenkins Dep. 14; Doc. No. 46-3, Jenkins Decl. ¶¶ 10, 12.)[4] Jenkins had no responsibility for classification or deciding cell assignments for inmates. (Jenkins Decl. ¶ 9; Jenkins Dep. 14.)

On this date, inmate Trey Banks was among the inmates who had been released from segregation, and he had been assigned to be Branch's cellmate in cell J-8. According to Branch, before that date he was aware of who Banks was but had never had "issues" with him and had never even spoken with him. (Branch Dep. 49.) Branch testified that he knew that Banks was a "loose cannon," had hit another inmate just before being assigned to the plaintiff's cell, and was "always, like, just throwing stuff." (*Id.* at 44–45.)

Branch was in his cell when the corrections officers and Banks arrived in J-pod outside his cell door. Upon their arrival in J-pod, the corrections officers directed Banks to go into his newly assigned cell, J-8, but Banks refused, stating that he did not want to be assigned to that cell. The officers continued to tell Banks to go into cell J-8, but Banks responded that, if he had to go into that cell, he would "beat up that old man," referring to Branch. (Branch Dep. 47.)

---

[3] The plaintiff purports to dispute this statement "in part," pointing to Jenkins' testimony that he was generally responsible for security at the Wilson County Jail. (*See* Doc. No. 55-2, Jenkins Dep. 13.)

[4] The plaintiff purports to dispute this statement, asserting that, "although classification officers assign cells, [Jenkins] retained supervisory authority to intervene in unsafe placements." (Doc. No. 56, Pl.'s Resp. SUF ¶ 5 (citing Jenkins Dep. 13–14.) The cited pages of Jenkins' deposition transcript do not support that assertion.

According to Jenkins, he was told by other officers that Banks was refusing to bunk with Branch and had claimed that he and Branch had "issues." (Jenkins Dep. 22.) Jenkins told Banks, "Okay, well, get your stuff. If you can't cell with him, we're going to take you back to . . . segregation for a little bit." (Jenkins Dep. 22.) At that point, Jenkins thought that Banks was saying that he could not cell with Branch in order to get a different cell assignment. (Jenkins Dep. 22; Jenkins Decl. ¶ 14.) Banks, in fact, suggested other cells that he would prefer to be moved into, including one with an inmate Jenkins knew had been designated as incompatible with Banks. (Jenkins Dep. 22.) Jenkins testified that it was "common in the Wilson County Jail for inmates to make threats of harm toward themselves or others in order to manipulate cell assignments." (Jenkins Decl. ¶ 15; *see also* Jenkins Dep. 22.) According to Jenkins, Banks was not known for being violent toward other inmates unless he had pre-existing problems with them, and, to his knowledge, Banks and Branch did not have any pre-existing problems. (Jenkins Decl. ¶¶ 17–18.) Jenkins testified that he did not believe that Banks would harm Branch if he was required to accept the assignment as Branch's cellmate. (Jenkins Decl. ¶ 19.)

Nonetheless, in light of Banks' refusal of the cell assignment, Jenkins "went to administration to see if an alternative cell assignment was feasible." (*Id.* ¶ 20.) Administration told him no other assignments were available and that Banks could either be assigned to J-8 or go back to segregation. (*Id.* ¶ 21.) Jenkins returned to J-pod and told Banks his options. He also told Banks that the assignment "would only be for a day and then the jail would rearrange the assignments." (*Id.* ¶ 22.) Given these options, Banks agreed to the assignment. (*Id.*)

The cell door was unlocked by the "tower," and Banks went into the cell. (*Id.* ¶ 23.) Another corrections officer closed the cell door and locked it. (*Id.*) As Jenkins began to walk away, another officer told him Branch and Banks were "in each other's face." (*Id.*) Before a physical alteration

occurred, the officers called for the "tower" to unlock the door but, before the door could be opened, Banks had hit Branch. (*Id.*; *see also* Jenkins Dep. 23.) Banks punched Branch with a closed fist, knocking him to the ground. (Branch Dep. 68–70.) Within moments, the cell door was re-opened, and correction officers entered the cell and separated the inmates. Branch was taken to the infirmary and then to Vanderbilt Hospital for treatment of his injuries. He never again interacted with Banks after this incident.

Despite knowing that Banks had a history of hitting other inmates, Branch did not believe that Banks was serious when he threatened to beat him up if he was placed in the same cell. (Branch Dep. 64, 65.) Even after Banks entered his cell, the plaintiff did not expect Banks to beat him up until it had actually happened. (*Id.* at 65.) According to Branch, Jenkins appeared surprised by the incident and was "just as freaked out as [he] was." (Branch Dep. 75.)

Branch testified that, because Jenkins was a supervisor, he was "supposed to know everything that's going on" and "should have know[n] better," meaning he should have known that Banks was a threat. (Branch Dep. 76, 75.) He characterized Jenkins' actions as "negligence." (*Id.* at 87.) Prior to and after the incident, Branch and Jenkins had a "generally respectful" relationship. (*Id.* at 87–88.)

During his incarceration at the Wilson County Jail, Branch never filed an inmate grievance about the February 9, 2023 incident or against Jenkins or any of the other corrections officers who were present or involved, though he remained at Wilson County Jail for nearly two and one-half months after the incident.

## IV. THE EXHAUSTION REQUIREMENT UNDER THE PLRA

At the end of his brief, after arguing that Branch fails to establish an Eighth Amendment violation, as discussed below, Jenkins asserts that he is entitled to summary judgment solely

because Branch failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (Doc. No. 48 at 17–18.)

In support of this ground for relief, Jenkins asserts that Branch did not plead exhaustion in his Complaint or attach to it any grievances related to the February 2023 incident. (*Id.* at 18.) However, exhaustion is an affirmative defense that must be pleaded and proved by the defendant. *Jones v. Bock*, 549 U.S. 199, 212 (2007). The plaintiff had no obligation to plead facts to avoid an affirmative defense. *Id.* at 216.

Next, Jenkins argues that there are no grievances related to the Banks incident in the plaintiff's inmate record and that Jenkins "has not alleged why he did not file any grievances pertaining to this incident or against Corporal Jenkins." (Doc. No. 48 at 18.) Indeed, the administrative exhaustion requirement is mandatory and not subject to judge-made exceptions. *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020). Nonetheless, when a defendant in prisoner civil rights litigation moves for summary judgment on administrative exhaustion grounds, the *defendant* must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies. *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012); *see also Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016).

In this case, Jenkins has not presented any evidence whatsoever regarding the existence of Wilson County Jail's administrative grievance procedure or the steps required to comply with it. Under these circumstances, the court finds that Jenkins has not carried his burden of showing that the plaintiff failed to exhaust administrative remedies. The court, therefore, declines to grant summary judgment on this ground and will consider the merits of the plaintiff's claim.

## V.    SUBSTANTIVE ANALYSIS

### A.    Legal Standard

To prove a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right, privilege, or immunity secured by the U.S. Constitution or federal law by a person acting under color of state law. *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978)); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). There is no dispute that Jenkins acted under color of law at all times relevant to this lawsuit, and the court has construed the Complaint as asserting a claim against him under § 1983 for violation of the plaintiff's rights under the Eighth Amendment.

Generally, prisoners are protected by the Eighth Amendment from cruel and unusual punishments. *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 683 (6th Cir. 2024) (citing U.S. Const. amend. VIII). This prohibition requires prison officials to provide inmates with, among other things, "reasonable measures of safety." *Zakora v. Chrisman*, 44 F.4th 452, 467 (6th Cir. 2022). Officials may violate that obligation by "display[ing] 'deliberate indifference' to a sufficiently serious risk of harm from which they owe an inmate protection." *Caraway*, 98 F.4th at 683. The Sixth Circuit refers to "this type of claim [as] a 'failure to protect.'" *Id.* (citation omitted).

A failure to protect claim has an objective component and a subjective component. "The objective component requires the [plaintiff] to [present evidence] that [he] faced an objectively excessive risk of harm." *Id.* at 683. A plaintiff cannot establish this element simply by pointing to a serious injury that he incurred while incarcerated. *Id.* Rather, irrespective of how serious the plaintiff's injury is, "the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party *before* the alleged injury occurred." *Id.* at 685 (emphasis in original) (quoting *Zakora*, 44 F.4th at 469).

The subjective component requires the plaintiff to show that the defendant "acted with 'deliberate indifference' to inmate safety, meaning the official was 'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it." *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 829, 834, 847); *see also Caraway*, 98 F.4th at 686. Under this standard, "mere negligence on the part of prison officials is not sufficient to give rise to culpability under the eighth amendment." *Stewart v. Love*, 696 F.2d 43, 44 (6th Cir. 1982). And "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 844). Thus, while prison officials clearly have a duty under the Eighth Amendment to protect prisoners from violence perpetrated by other prisoners, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Reedy*, 988 F.3d at 912 (quoting *Farmer*, 511 U.S. at 834).[5]

## B. Risk of Harm Component

The defendant argues first that the plaintiff cannot show that he was exposed to an objectively serious risk of harm and that this element of the claim requires evidence of a substantial *risk* of harm, not merely a showing that he suffered an objectively serious *injury*. (*See* Doc. No. 48 at 9.) The plaintiff responds that there is at least a material factual dispute as to whether he was exposed to an objectively serious risk. (Doc. No. 55 at 4–5.) He argues both that (1) "[w]here an inmate suffers severe injuries from another prisoner's attack, the objective component is plainly

---

[5] The Sixth Circuit has also held that both the PLRA and the Eighth Amendment require a prisoner seeking damages to show that he suffered something "more than *de minimis*" injury. *Wallace v. Coffee Cnty.*, 852 F. App'x 871, 878 (6th Cir. 2021) (quoting *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010)). There is no dispute in this case that the injuries suffered by Branch more than satisfy this requirement.

met"; and (2) the placement of an inmate known to "pose[] a threat to a large class of inmates" in the plaintiff's cell "without protective measures" clearly "presented a substantial risk to the plaintiff." (*Id.* at 5 (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004)).)

As noted above, there is no dispute that the injuries suffered by the plaintiff were sufficient to satisfy the threshold requirements of the PLRA and the Eighth Amendment. *See* Note 5. However, *Greene* does not support the proposition that a serious injury is all that is required to satisfy the objective component of a failure to protect claim. In *Greene*, the fact that the plaintiff had been seriously injured by another inmate was not in dispute.

The only issue in *Greene* was whether the plaintiff had presented facts sufficient to establish that the defendant—the warden of the facility where she was incarcerated—was subjectively aware of a substantial risk of serious harm to the plaintiff, who had been seriously beaten while in protective custody. Specifically, the plaintiff showed that the warden knew that she was a male-to-female transsexual, in light of which he had placed her in protective custody for her safety, and that he was aware that transgender inmates are particularly vulnerable to the risk of physical and sexual assault. In addition, the plaintiff showed that the inmate who had assaulted her while they were both in protective custody was a maximum-security inmate with a lengthy history of prison misconduct and that the warden was personally aware that the other inmate had a "long institutional history of being a disruptive, violent inmate." *Greene*, 3661 F.3d at 294–95. Based on these facts, the court concluded that a reasonable jury could find that the warden had "knowledge of a risk to [the plaintiff's] safety because of her status as a vulnerable inmate and because of Frezzell's status as a predatory inmate." *Id.* at 295.

The plaintiff attempts to analogize to *Greene*, arguing that the facts in this case show that (1) Banks made an explicit threat in Jenkins' presence; (2) Jenkins was aware that Banks had a

history of violence. (Doc. No. 55 at 10.) For purposes of summary judgment, the court accepts Branch's allegation that Jenkins knew that Banks had threatened to "beat up" the plaintiff if he was forced to share a cell with him. (*See* Branch Dep. 47.) However, the Sixth Circuit has expressly observed that "[t]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Reedy*, 988 F.3d at 915 (quoting *Varmado-El v. Martin*, 52 F. App'x 764, 765-66 (6th Cir. 2002)). Thus, the question is whether, under the circumstances, the decision to place Banks in Branch's cell despite that threat posed an objectively serious risk of harm to Branch, in light of the plaintiff's particular vulnerability, Banks' history of violence, and other circumstances.

Unlike in *Reedy* and *Greene*, the record contains no evidence that the plaintiff was particularly vulnerable to assault. He claims that Banks referred to him as an "old man," and the record indicates that he was around 59 years old at the time of the assault. (Booking Intake, Doc. No. 46-1 at 1.) But his age, standing alone, does not establish that he belonged to "a class of prisoners particularly vulnerable to assault." *Reedy*, 988 F.3d at 915 (citing cases holding that transgender inmates and "small, youthful prisoners" are particularly vulnerable to assault). The plaintiff does not allege that he was transgender or youthful, nor does he claim that he was particularly small, physically frail, or in poor health at the time. Further, his Booking Intake states that he was 5'8" and 180 pounds on intake. (Doc. No. 46-1 at 1.)

As for Banks' history of violence, unlike the attacker in *Greene*, he was not known to be a "predatory" inmate. Rather, the record indicates that Banks has "a lot of issues" and a "very aggressive personality," as he had attacked one other inmate while at Wilson County Jail prior to assaulting the plaintiff. (Jenkins Dep. 17.) The other attack was not unprovoked; it occurred after the other inmate had "threatened Mr. Banks with a broom." (Jenkins Dep. 15–16.) He attacked the

same inmate again during a "med call," after they had been separated, though that assault did not result in "severe injuries." (*Id.* at 17.) In addition, although Banks was also generally known to be "noncompliant" in "taking orders from" jail personnel (*id.* at 32), the evidence in the record does not indicate that this noncompliance typically took the form of violence.

In other words, although Banks was known to have assaulted another inmate, he apparently had been provoked by that inmate, and he was not known to have attacked other inmates without provocation. Banks and Branch had not previously had any known interactions or altercations. In addition, Jenkins gave Banks the option either to go into his assigned cell or to return to segregation, while also assuring Banks that the cell assignment would be temporary and that he would be reassigned the next day. (Jenkins Decl. ¶¶ 21–22.) Given these options, Banks acquiesced and agreed to go into cell J-8. (*Id.* ¶ 22.) Under all of these circumstances, no reasonable jury could conclude that temporarily placing Banks in Branch's cell created an objectively serious risk that Banks would assault Branch.

Based on the plaintiff's failure to present sufficient evidence to support the objective component of his claim, the defendant is entitled to summary judgment.

## C. Deliberate Indifference Component

Moreover, even if the court had found that Branch's threat combined with his recent history of assaulting another inmate, standing alone, were sufficient to establish that placing him against his will in the plaintiff's cell created an objectively serious risk of serious harm to Branch, the plaintiff's claim founders on the deliberate indifference component as well. That is, the plaintiff has not presented sufficient evidence from which a reasonable jury could conclude either that Jenkins was "subjectively aware of the risk" posed by Banks or that he "fail[ed] to take reasonable measures to abate it." *Reedy*, 988 F.3d at 912.

*1.      Jenkins' Subjective Awareness of the Risk*

Viewing the facts in the light most favorable to the plaintiff, the court accepts that Jenkins knew as of the date of the placement that Banks had recently assaulted another inmate, had a "lot of issues" and an "aggressive personality," and was generally noncompliant with orders. (Jenkins Dep. 16–17, 32.) However, no evidence indicates that Jenkins possessed information indicating that Banks had a propensity for "being violent toward other inmates unless he had pre-existing problems with them." (Jenkins Decl. ¶ 17.) Jenkins was not aware of pre-existing problems between Banks and Branch. Branch, in fact, admits that he had never before spoken with Banks.

In addition, Jenkins knew based on his experience as a corrections officer that inmates often threatened violence to try to obtain cell assignments they considered more favorable, and he believed that Banks was trying to manipulate the system on that occasion, without actual intent to carry through with the threat. That is, according to Jenkins, he "believed that Mr. Banks made this statement [threatened problems with Branch] as part of an attempt to get assigned to cell J-2"; "[i]t was common in the Wilson County Jail for inmates to make threats of harm toward themselves or others in an effort to manipulate cell assignments"; and "[i]t was common for such threats to be empty and for those same inmates to not follow through with them." (Jenkins Decl. ¶¶ 14–16.)

Jenkins also testified that he did not believe that Banks would cause harm to Branch if he was required to accept the cell assignment. (*Id.* ¶ 19.) The Sixth Circuit recognizes that courts "may infer the existence" of subjective knowledge of a substantial risk "from the fact that the risk of harm is obvious." *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). *Wilson*, however, involved the obvious risks posed by the coronavirus pandemic. *Id. Hope* involved allegations that the plaintiff was handcuffed to a hitching post for seven-hour period during which he was exposed to the heat of the sun, deprived of bathroom breaks, and suffered "prolonged thirst and taunting." *Hope*, 536 U.S. at 738. The Court held that

these conditions obviously amounted to the "gratuitous infliction of 'wanton and unnecessary pain'" prohibited by the Eighth Amendment. *Id.* Conversely, in this case, the situation was not obviously punitive, and nothing in the record calls into question Jenkins' credibility generally or the veracity of his statement about his subjective belief specifically. Branch does not allege that Jenkins was generally vengeful or sadistic or intended him harm, and he testified that, both prior to and after the incident, he and Jenkins had a "generally respectful" relationship. (Branch Dep. 87–88.) The plaintiff himself did not expect Banks to attack him, even after his threat, and he acknowledged that Jenkins seemed just as surprised as he was by the assault. (Branch Dep. 64–65, 75.) Branch believed that Jenkins felt bad about what happened to him. (Branch Dep. 87.) While the court accepts as true the plaintiff's statement that Jenkins could have exercised his discretion to send Banks back to segregation rather than placing him with the plaintiff, the fact that he *could* have does not mean that he *should* have, absent a reason to expect that Banks would carry out his threat to harm Branch.

The evidence, at most, establishes that Jenkins was negligent. The plaintiff, in fact, accuses Jenkins of negligence. (Branch Dep. 87.) But "mere negligence on the part of prison officials is not sufficient to give rise to culpability under the eighth amendment." *Stewart*, 696 F.2d at 44. In sum, the plaintiff lacks evidence from which a reasonable jury could conclude that Jenkins was subjectively aware that placing Banks in Branch's cell posed a substantial risk of harm to Branch.

## 2. Failure to Take Reasonable Measures to Abate Risk

Finally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Here, even if the court accepts that Jenkins was subjectively aware of an objectively serious risk of harm to the plaintiff, the plaintiff cannot establish that Jenkins responded unreasonably to that risk.

The plaintiff asserts that, once Banks threatened to hurt Branch if required to share a cell with him, a substantial risk of harm was created. However, Jenkins did not ignore that risk. He asked "administration" for another cell assignment for Banks. When no other cell assignment was immediately available, he gave Banks the option of returning to segregation or accepting the assignment to J-8 and getting reassigned the next day. (Jenkins Decl. ¶¶ 21–22.) Once Banks appeared to accept that assignment and voluntarily entered the cell, given all of the other information in Jenkins' possession as discussed above, Jenkins reasonably believed that the situation had been diffused. Nonetheless, as soon as the cell door closed behind Banks and Banks addressed Branch in a threatening manner, Jenkins and the other officers immediately called for the "tower" to reopen the cell. Although the cell door was not unlocked in time for them to prevent Banks' assault on Branch, officers were in the cell within seconds, preventing further harm. After the incident, Branch received medical treatment, and he never interacted with Banks again. Under these circumstances, no reasonable jury could find that Jenkins responded unreasonably to the risk posed by placing Banks in the same cell with Branch.[6]

---

[6] Jenkins also argues that he is entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This standard presupposes two things: first, that the facts alleged by the plaintiff are sufficient to state a constitutional claim; and second, that the constitutional right which the officer has purportedly violated was clearly established at the time of the harm giving rise to the action." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 257 (6th Cir. 2015). Here, because there is no genuine dispute of material fact as to whether the defendant violated plaintiff's Eighth Amendment rights, the court has no to address whether Jenkins is entitled to qualified immunity.

**VI.     CONCLUSION**

For the reasons set forth herein, Jenkins' Motion for Summary Judgment (Doc. No. 46) will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge